UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| TIMOLEON PANAGOPOULOS,<br><br>　　Plaintiff,<br><br>　　v.<br><br>GENUINE FOOD LAB, LLC, AND<br>JEFFREY MILLS<br><br>　　Defendants. | C.A. NO.: 1:21-CV-11873-ADB |

**AMENDED ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS, AND JURY CLAIM**

NOW COME the defendants, Genuine Food Labs, LLC ("Genuine Food"), and Jeffrey Mills (collectively the "Defendants"), by and through counsel, DENNEHY LAW, and file this Amended Answer, Affirmative Defenses, Counterclaims, and Jury Claim in response to the Complaint filed by Timoleon Panagopoulos ("Plaintiff"), paragraph by paragraph as follows:

**PARTIES**

1.　　Admitted.

2.　　Admitted that Genuine Food is a Delaware corporation, but it denies that its principal place of business is in Massachusetts.

3.　　Admitted that Jeffrey Mills is a resident of Maine, but denied that he has an address in Weymouth, Massachusetts and/or that he operates any business in his individual capacity.

4.　　Denied.

## JURISDICTION AND VENUE

5. Admitted.

6. Admitted that Suffolk County was the proper venue for state court filing, but the Defendants deny that all of the wrongful conduct occurred there.

## FACTS

7. Admitted.

8. Admitted that Mr. Mills has an ownership interest in Genuine Food; however, the business is a limited liability company and so the appellations applied to his titles are incorrect and denied.

9. Denied.

10. Admitted.

11. Denied.

12. Denied.

13. Denied.

14. Denied.

15. Admitted that the Plaintiff had industry contacts; however, the Defendants cannot admit or deny whether the Plaintiff had good credit.

16. Denied. In further answering the Defendants stat that the allegation in this paragraph have been mischaracterized.

17. Denied.

18. Denied. In further answering, the Defendants state that the Plaintiff was never hired as an employee of genuine Food. Rather, he worked in the role of a broker and/or middle person under his own sole proprietorship and/or a limit liability company

in which he has ownership. The Plaintiff was entitled to commissions from suppliers with whom he worked, but he was not entitled to payment and/or commissions from Genuine Food.

19. Denied.

20. Denied.

21. Denied.

22. Denied.

23. Denied.

24. Admitted that the Plaintiff was likely compensated from suppliers, but the remainder to the allegations in this paragraph are denied.

25. Denied.

26. Denied.

27. Denied.

28. Denied.

29. Denied.

30. Denied.

31. Denied.

32. The Defendants are without sufficient information to admit or deny the allegations contained in this paragraph because the Plaintiff was a broker functioning as an independent contractor for suppliers, who made arrangement for payment of commissions to the Plaintiff, from the suppliers of products to the Plaintiff, which in turn the products were sold to Genuine Food.

33. The Defendants dispute the Plaintiff was ever an employee of Genuine Food. The Plaintiff was a broker, who ran a business where he was paid by suppliers of products and not end purchasers, such as Genuine Food. In further answering, the Defendants state that the letter attached to the Complaint speaks for itself.

## COUNTS

## COUNT I
## FAILURE TO PAY WAGES IN VIOLATION OF THE MASSACHUSETTS WAGE ACT

34. This is a paragraph of incorporation, and therefore a response is not required. To the extent that allegations can be inferred from this paragraph, they are denied.

35. Denied.

36. Denied. In further answering, the Defendants state that much of this paragraph merely speaks to legal conclusions for which a response is not required.

37. Denied.

38. Denied.

## COUNT II
## BREACH OF CONTRACT

39. This is a paragraph of incorporation, and therefore a response is not required. To the extent that allegations can be inferred from this paragraph, they are denied.

40. Denied.

41. Denied.

42. Denied.

43. Denied.

## COUNT III
## PROMISSORY ESTOPPEL

44. This is a paragraph of incorporation, and therefore a response is not required. To the extent that allegations can be inferred from this paragraph, they are denied.

45. Denied.

46. Denied.

## COUNT IV
## FRAUD

47. This is a paragraph of incorporation, and therefore a response is not required. To the extent that allegations can be inferred from this paragraph, they are denied.

48. Denied.

49. Denied.

50. Denied.

51. Denied.

52. Denied.

53. Denied.

54. Denied.

## COUNT V
## NEGLIGENT MISREPRESENTATION

55. This is a paragraph of incorporation, and therefore a response is not required. To the extent that allegations can be inferred from this paragraph, they are denied.

56. Denied.

57. Denied.

58. Denied.

59. Denied.

60. Denied.

61. Denied.

## COUNT VI
## UNJUST ENRICHMENT/QUANTUM MERUIT

62. This is a paragraph of incorporation, and therefore a response is not required. To the extent that allegations can be inferred from this paragraph, they are denied.

63. Denied.

## COUNT VII
## UNFAIR AND DECEPTIVE BUSINESS PRACTICES

64. This is a paragraph of incorporation, and therefore a response is not required. To the extent that allegations can be inferred from this paragraph, they are denied.

65. Denied. In further answering, the Defendants state that much of this paragraph merely speaks to legal conclusions for which a response is not required.

66. Denied.

67. Denied.

68. Denied.

69. Denied.

## AFFIRMATIVE DEFENSES

1. The Complaint fails to state a claim in which relief can be granted.

2. The Complaint fails for lack of personal jurisdiction.

3. The Complaint fails for lack of subject matter jurisdiction.

4. The Complaint fails due to accord and satisfaction.

5. The Complaint fails due to waiver, laches, and/or estoppel.

6. The Complaint fails due to Breach of Contract by the Plaintiff.

7. The Complaint fails due to the Plaintiff's unclean hands.

8. The Complaint fails where the Plaintiff sued parties who were not privy in contract with him as to the damages he claims, did not employ him, and/or cannot be held liable under the law applicable to the facts of this matter.

9. The Complaint fails due to misconduct of the Plaintiff, which includes Breach of Contract and breach of the Covenant of Good Faith and Fair Dealing.

10. The Complaint fails due to the Plaintiff failing to exhaust his administrative remedies.

11. The Complaint fails due to waiver and limitations defenses.

12. The Complaint fails due to full performance.

13. The Complaint fails because the Plaintiff failed to satisfy conditions precedent prior to bringing the lawsuit.

14. The Complaint fails due to the Plaintiff's failure to perform.

15. The Complaint fails due to the Plaintiff's rescission of any agreement between her and a Defendant(s).

20. The Plaintiff failed to mitigate his damages.

21. Any damages the Plaintiff claims in this lawsuit is a result of his conduct or the conduct of someone not under the control of any Defendant.

22. The Defendant(s) is entitled to an Off-Set and/or Recoupment that reduces the Plaintiff's damages, meets the Plaintiff's damages, and/or exceeds the Plaintiff's damages.

## COUNTERCLAIMS

NOW COME the defendants, Genuine Food Lab, LLC ("Genuine Food"), and Jeffrey Mills (collectively the "Counterclaim Plaintiffs") and bring Counterclaims against Timoleon Panagopoulos ("Panagopoulos"), paragraph by paragraph as follows:

## PARTIES

1. Genuine Food is a Delaware limited liability company with a principal place of business located in New York, New York.

2. Jeffrey Mills is an individual with a residence in the State of Maine.

3. Panagopoulos is an individual who resides in Charlestown, Massachusetts. He has functioned as a sole proprietor, and independent contractor, working as a broker in the wholesale foods industry. Further, he served as Managing Member of EHFAR, LLC ("EHFAR"), a Massachusetts limited liability company.

## JURISDICTION AND VENUE

4. This Court has diversity jurisdiction over this matter, pursuant to 28 U.S.C. §§ 2201 and 1332, where the Plaintiff resides in Massachusetts, and defendant Mills resides in Maine. Further, defendant, Genuine Food, is a Delaware limited liability company, and its principal place of business is New York, New York.

5. The amount in controversy exceeds $75,000.

6.   Venue is proper in the Eastern District, where the Plaintiff resides in the district, and much of the conduct occurring in Massachusetts took place in the Eastern District.

## FACTS

7.   Panagopoulos is an entrepreneur and small business owner, who has also worked as a broker in the manufacturer and wholesale foods industry.

8.   Panagopoulos is an owner of Better Bagels, a bagel shop in Boston; Top Shelf, a grocery store in Boston; EHFAR a wholesale food broker business; iKnow Concierge, a mobile application. He also works as a broker for Golchin-OFD USA, a wholesale foods business.

9.   Genuine Food operates in a meal packaging space, delivering quality wholesome meals to schools K-12, higher education, senior and hospital facilities, and throughout various communities. Genuine Food had knowledge of Panagopoulos working as a broker in the manufacturer and wholesale food space.

10.   During April 2020, Genuine Food sought to utilize Panagopoulos' broker services in order to purchase food products at more competitive rates from suppliers of wholesale food products, and the suppliers selling the products to Genuine Food were responsible for Panagopoulos' broker commissions (hereafter the "Primary Agreement").

11.   The arrangement for the Primary Agreement was quite simple. Genuine Food would contact wholesale food suppliers and obtain a quote for an order. Genuine Food would then contact Panagopoulos and explain the quote and ask him if he could get a more competitive price from another source. In the event Panagopoulos could get a better price for a product, Genuine Food would endeavor to purchase the food product

from that source. As a broker, Panagopoulos would get paid a commission from the wholesale food supplier, who sold the product to Genuine Food.

12. On April 21, 2020, Panagopoulos, as a broker, introduced Genuine Food to Cherrish Juice, a juice manufacturer.

13. On April 21, 2020, Jeff Mills of Genuine Foods sent an email to Panagopoulos, placing an order for various food products. The email demonstrates that Panagopoulos was working as a go-between, serving in a broker role. Another email from Panagopoulos to Frank Klein of Genuine Foods states that Panagopoulos is not involved with the needs of Genuine Foods, but rather he acts as a middleman.

14. On July 3, 2020 and August 27, 2020, Panagopoulos exchanged emails with George Martinez of Cherrish Juice. The email exchange clearly demonstrates that Panagopoulos was functioning as a broker relative to the Primary Agreement. Further, the email exchange expressly states that Panagopoulos was to be paid a commission from Cherrish Juice for sales to Genuine Food once Cherrish Juice received payment for the product.

15. Upon information and belief, Panagopoulos got paid substantial commissions from several manufacturers and/or wholesale food suppliers pursuant to this arrangement. Pursuant to the Primary Agreement, Panagopoulos merely served as a broker, getting paid by others.

16. During the Spring 2020, Genuine Food entered into another arrangement with Panagopoulos in which he agreed to share a portion of his commission, which he obtained from manufacturers and/or wholesale food suppliers that Genuine Food introduced to Panagopoulos. In addition, although Genuine Food is not regularly engaged

in the manufacture or sale of food products, it occasionally has overstock of perishable items that can be sold rather going to waste. To that end, Genuine Food agreed to split the amount of any sales it made over such overstock items through the use of Panagopoulos' services (the arrangement described in this paragraph is hereafter "Secondary Agreement").

17. Although Genuine Food placed Panagopoulos into contact wither various manufacturers and/or wholesale food suppliers, pursuant to the Secondary Agreement, Panagopoulos failed to share any commissions arising from sales he obtained through contacts provided to him by Genuine Food, which Genuine Food estimates to be substantial.

18. Conversely, Genuine Food abided by the terms of the Secondary Agreement. On July 13, 2020, Genuine Foods paid Panagopoulos $8,164.80 relative to the sale of overstock food times, pursuant to the Secondary Agreement.

19. As an independent broker and middleman, Panagopoulos set his own hours, worked from his own offices, provided his own equipment, and was free to run is various business and contract with others in the same space as Genuine Food, and, in fact, Panagopoulos did provide similar broker services to others. Panagopoulos would often go weeks without making contact with anyone from Genuine Food.

20. Genuine Food does not provide broker services to manufacturers and/or wholesale food suppliers.

21. Upon information and belief, Panagopoulos operated EHFAR as a food broker business, where he worked as the Managing Member from June 2020 until

present. Prior to serving as a Managing Member of EHFAR, Panagopoulos is believed to have worked as a sole proprietor.

22. Panagopoulos was never an employee of Genuine Food. He never sought to be onboarded through payroll, and never requested any benefits, despite owning several business over the years, including during the timeframe described in the Complaint.

23. Panagopoulos was at all times working as an independent broker relative to the Primary Agreement, where he was to be paid a commission by the manufacturers and/or wholesale food suppliers, and not the buyers of products, such as Genuine Food. Panagopoulos served as a broker and on occasion as an independent contractor, pursuant to the Secondary Agreement, where Genuine Food was only required to pay Panagopoulos relative to arrangements for the occasional sale of overstock items. Panagopoulos who had commissions arrangements with various manufacturers and suppliers of food products. He served as a distributor in a classic middle-person role, making contacts and receiving payment from the parties making the sales.

24. Panagopoulos was not required to have an exclusive arrangement with Genuine Food, and he was free to set his own hours, work from whatever location he chose, and contract with other buyers of food products similarly situated as Genuine Food.

25. Upon information and belief, Panagopoulos provided his services to other buyers of food products.

26. On October 13, 2020, Panagopoulos sent an email to Genuine Food representative Jeffrey Mills complaining that many people profited from the emergency

programs related to the pandemic. Panagopoulos sought to unilaterally renegotiate the terms of the Primary Agreement and attempted to characterized the "added value" his broker services had provided to Genuine Food. Panagopoulos did not attempt to characterize his value in terms of company wages, but rather he attempted to express his contribution as a percentage of the savings Genuine Food received relative to Panagopoulos' broker services. Panagopoulos estimated the savings at $131,000. In closing the email, Panagopoulos stated that Genuine Food should have "come to me with something to show appreciation."

27. On March 11, 2021, Panagopoulos sent an email to Genuine Food with an invoice from EHFAR, which included a description of monthly broker fees and a payment amount of $150,000.

28. On March 11, 2021, Panagopoulos signed a W9 Form attesting that EHFAR was an independent contractor in connection with the EHFAR invoice.

29. On March 11, Genuine Food informed Panagopoulos that his invoice had been submitted in contradiction with his agreement with Genuine Food and that it would not be paid.

30. During the period from October 2020 to present, Panagopoulos has commented to Genuine Food and others that he helped the company make millions of dollars and that Genuine Food should buy him an Aston Martin for his efforts.

31. Panagopoulos feels that he basically made Genuine Food successful. He feels that he should be nicely compensated for things having worked out. Panagopoulos does not seek payment for wages and compensation. He does not seek payment for services performed to an agreement. Rather, he seeks payment for what he estimates as

"added value" while ignoring the commissions he received from manufacturers and wholesale food suppliers.

32. Panagopoulos has expressed a great deal of anger towards the Defendants for his perceived insult in their decision to honor their agreements over his unilateral attempt to demand additional compensation, including payment by means of a gift of an Aston martin.

33. Panagopoulos has directed his anger by contacting Genuine Foods employees, former employees, business associates, and others and complaining about the company, misrepresenting the terms of their agreements, and claiming he has been mistreated.

34. Panagopoulos never entered into an employer / employee relationship with Genuine Food. He knows perfectly well that he cannot prevail on a wage claim in this matter. Panagopoulos has filed a wage claim, not to seek compensation, but rather as a retaliatory measure meant to smear the Defendants. He also sought a means to sue Jeffrey Mills personally. Panagopoulos' ulterior motives for bringing his wage claim, include harming the business reputations of the Defendants in a small foods marketplace.

35. Panagopoulos' invoice through EHFAR to Genuine Food, reflects he was working as as broker, which was a tacit admission that he was never an employee of Genuine Food.

36. Genuine Food denies that Panagopoulos was ever its employee; however, in the event he could ever be considered an employee, all of the commissions he earned from others during the timeframe described in the Complaint would belong to Genuine Food and should be paid over to it.

14

## CLAIMS

### COUNT I
### (Breach of Contract)

37. Genuine Food relies upon and incorporates by reference the paragraphs above as if specifically set forth herein.

38. Panagopoulos entered into an agreement to provide Genuine Food with compensation relative to manufacturers and suppliers in which Genuine Food provided to Panagopoulos as sales leads.

39. Upon information and belief, Panagopoulos acted as an independent broker, independent contractor / distributor and operated as a sole proprietor at times, as well as a Member of EHFAR.

40. Genuine Food placed leads with Panagopoulos pursuant to the Secondary Agreement.

41. Upon information and belief, Panagopoulos received compensation due to sales leads provided by Genuine Food. Panagopoulos failed to pay any renumeration to Genuine Food relative to compensation he received through the leads it provided.

Wherefore, Genuine Food has been damaged and continues to be damaged by Panagopoulos, and it seeks all damages available at law, including legal fees and costs.

### COUNT II
### (Breach of Covenant of Good Faith and fair Dealing)

42. Genuine Food relies upon and incorporates by reference the paragraphs above as if specifically set forth herein.

43.     Panagopoulos entered into an agreement to provide Genuine Food with compensation relative to manufacturers and suppliers in which Genuine Food provided to Panagopoulos as sales leads.

44.     Upon information and belief, Panagopoulos acted as an independent broker, independent contractor / distributor and operated as a sole proprietor at times, as well as a Member of EHFAR.

45.     Genuine Food placed leads with Panagopoulos pursuant to the Secondary Agreement.

46.     Upon information and belief, Panagopoulos received compensation due to sales leads provided by Genuine Food. Panagopoulos failed to pay any renumeration to Genuine Food relative to compensation he received through the leads it provided.

47.     Panagopoulos' attempts to recast his broker / independent contractor role into an employment agreement violates the covenant of good fair and fair dealing that accompanies any business contract.

Wherefore, Genuine Food has been damaged and continues to be damaged by Panagopoulos, and it seeks all damages available at law, including legal fees and costs.

## COUNT III
**(Abuse of Process)**

48.     Genuine Food and Mills rely upon and incorporates by reference the paragraphs above as if specifically set forth herein.

49.     Panagopoulos' attempts to recast his independent contractor role into an employment agreement violates the covenant of good fair and fair dealing that accompanies any business contract.

50.     Panagopoulos has inflated views of himself and his contributions to various business relationships. This can be seen in his emails to representatives of various business relationships.

51.     The conduct noted herein also serves as an abuse of process relative to any claims Panagopoulos has asserted relative to wages and/or the employment context. Further, any claims that he has asserted relative to defendant Mills serving in an individual capacity also serves as an abuse of process.

52.     The conduct noted herein demonstrates that Panagopoulos cannot possibly expect to prevail upon his wage claim. His wage claim was not filed in an effort to seek compensation. It was not filed merely as a frivolous claim. Rather, he filed the wage claim for ulterior reasons in retaliation of not being given an Aston Martin. Panagopoulos had a particular dislike of Mills and wanted to sue him personally. These efforts by Panagopoulos are geared at retaliation where he hopes to smear the Defendants in a rather small foods marketplace.

Wherefore, Genuine Food has been damaged and continues to be damaged by Panagopoulos, and it seeks all damages available at law, including legal fees and costs.

## COUNT IV
### (Recoupment)

53.     Genuine Food relies upon and incorporates by reference the paragraphs above as if specifically set forth herein.

54.     Genuine Foods categorically denies that Panagopoulos was ever its employee. However, in an alternative pleading practice, Genuine Food pleads that if Panagopoulos was ever legally deemed to have been its employee, with wages and benefits owed to him, Genuine Foods is entitled to receive all monies it paid to

Panagopoulos, as well as any monies he received for commissions from others while allegedly serving as an employee for Genuine Food.

Wherefore, Genuine Food has been damaged and continues to be damaged by Panagopoulos, and it seeks all damages available at law, including legal fees and costs.

**THE DEFENDANTS/COUNTERCLAIM PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES TRIABLE.**

Respectfully submitted,

GENUINE FOOD LAB, LLC, AND JEFFREY MILLS

By Their Attorneys,

 */s/ John W. Dennehy*
_____
John W. Dennehy, P.C., BBO No. 658247
DENNEHY LAW
127 Main Street, Suite 1
Nashua, NH 03060
Dated: March 30, 2022    Telephone: (603) 943-7633
jdennehy@johnwdennehy.com

**CERTIFICATE OF SERVICE**

       This shall hereby certify and acknowledge that I, John W. Dennehy, have filed the above-referenced pleading through the CM/ECF system, and it will be sent electronically to the registered participants as identified on the NEF, and paper copies will be sent to non-registered participants and all counsel of record on March 30, 2022, via First Class Mail and Email, upon all counsel of record as follows:

Jonathan D. Plaut, Esq.
COHAN RASNICK PLAUT LLP
One State Street, Suite 1200
Boston, MA 02109

                                                */s/ John W. Dennehy*

                                                John W. Dennehy